**Affirmed and Memorandum Opinion filed November 14, 2023.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-22-00210-CV

---

## IN RE COMMITMENT OF MIKE ROBERT WEISINGER

---

**On Appeal from the 176th District Court
Harris County, Texas
Trial Court Cause No. 492764Z**

---

## MEMORANDUM OPINION

In this appeal from a final determination, a jury found that Mike Robert Weisinger is a sexually violent predator as defined in chapter 841 of the Texas Health and Safety Code (otherwise known as the Texas Civil Commitment of Sexually Violent Predators Act) and therefore subject to civil commitment. *See* Tex. Health & Safety Code Ann. §§ 841.001-.151. On appeal, Weisinger contends the evidence is legally and factually insufficient to "support the 'behavioral abnormality' element of the State's case." We affirm.

## THE TEXAS CIVIL COMMITMENT OF SEXUALLY VIOLENT PREDATORS ACT

The Texas Civil Commitment of Sexually Violent Predators Act (the "Act") provides for the civil commitment of sexually violent predators based on legislative findings that "a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory actions of sexual violence." Tex. Health & Safety Code Ann. § 841.001. The Legislature expressly found that "a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state." *Id.*

Under the Act, a person is a sexually violent predator if the person (1) is a repeat sexually violent offender,[1] and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act[2] of sexual violence. *Id.* § 841.003(a). A person must be administratively determined to be a sexually violent predator before the State files suit. *Id.* §§ 841.021-.023; *In re Commitment of Bohannan*, 388 S.W.3d 296, 298 (Tex. 2012). When the administrative determination is made, notice is given to an attorney representing the State. Tex. Health & Safety Code Ann. § 841.023.

Once the person is referred to the State, an attorney representing the State may file a civil commitment proceeding in the court of conviction for the person's most recent sexually violent offense. *Id.* § 841.041(a). If a judge or jury determines that

---

[1] "Sexually violent offense" means, among other things, (1) an offense under Texas Penal Code sections 21.02 (Continuous Sexual Abuse of Young Child or Disabled Individual), 21.11(a)(1) (Indecency with a child), 22.011 (Sexual Assault), or 22.021 (Aggravated Sexual Assault); and (2) an offense under prior state law that contains elements substantially similar to the elements of an offense listed above. *See id.* § 841.002(8)(A), (F).

[2] "'Predatory act' means an act directed toward individuals, including family members, for the primary purpose of victimization." *Id.* § 841.002(5).

the person is a sexually violent predator, the trial court must commit the person for treatment and supervision to begin on the date of release from prison and to continue "until the person's behavioral abnormality has changed to the extent that the person is no longer likely to engage in a predatory act of sexual violence." *See id*. § 841.081(a).

## BACKGROUND

Weisinger is an inmate serving two forty-year concurrent sentences for aggravated sexual assault of a child. On July 13, 2020, the State filed a petition alleging Weisinger is a sexually violent predator and requesting that he be committed for treatment and supervision. In November 2021, the case proceeded to trial and the jury heard evidence from two witnesses: Weisinger and the State's expert, Dr. Kyle Clayton.

## I. Dr. Clayton's Testimony

Dr. Clayton, a psychologist, performed a clinical assessment of Weisinger while preparing his expert opinion about whether Weisinger suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Clayton has a master's degree and doctorate in clinical psychology, is board certified, and his specialization is forensic psychology. He has been licensed in Texas since 2012, has a private practice in forensic psychology, and is a clinical assistant professor of psychiatry at UT Southwestern Medical Center. He has been involved in approximately 50 behavioral abnormality evaluations and has performed hundreds of sex offense risk assessments.

Clayton's methodology for conducting a behavioral abnormality evaluation is to review records, conduct an interview, and perform testing. At trial, he identified and discussed numerous risk factors that he considered while evaluating whether

3

Weisinger has a behavioral abnormality. While forming his expert opinion, Clayton reviewed relevant psychologist's evaluations and assessments, police investigative documents, victim statements, court documents, prison records, criminal history records, sexual history, medical records, treatment records, and Weisinger's deposition. After reviewing this information and interviewing and testing Weisinger, Clayton concluded that he has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence.

### *Sexual Offending History*

In forming his opinion that Weisinger suffers from a behavioral abnormality, Clayton considered the underlying facts and details of Weisinger's prior convictions for sexual offenses against children as well as the allegations and admissions of sexual offenses that did not lead to convictions. According to the records and Weisinger's interview with Clayton, Weisinger started exposing his genitals to prepubescent females at the age of 12 and exposed himself on multiple occasions to prepubescent girls until he was 17.

The first time Weisinger got "into legal trouble" for indecent exposure was when he was around 16 or 17 years old "and had some sort of diversionary program that he was referred to due to that offense." Weisinger also engaged in contact sexual offenses while he was a juvenile. Records indicate that at age 13 "he gave oral sex to an 8-year-old male cousin." Clayton considered the juvenile sexual offending history to be important because it shows Weisinger's "sexual offending started early and then persisted throughout the course of his life." Clayton also considered the fact that Weisinger engaged in contact and noncontact offenses "because those who have both types of offenses are at a higher risk for reoffending in the future."

As an adult, Weisinger continued committing contact and noncontact sexual offenses against children. He admitted repeatedly exposing himself to prepubescent

4

girls and reported two contact offenses that happened when he was 18 years old and in his mid-20s, respectively.

Weisinger was charged with indecency with a child after he exposed himself several times to a 12-year-old girl at his apartment complex. He denied the incident, or exposing himself to Heather in general, but he admitted to exposing himself to other individuals during that time.

Weisinger's first conviction as an adult at age 29 was for sexual abuse of a child. His victims were a nine-year-old boy named Scott and an eight-year-old boy named Jimmy B.; both victims were strangers. Weisinger claimed that Scott had approached him in October 1981 and asked if he was interested in performing oral sex. Weisinger performed oral sex on Scott. Clayton testified that Weisinger's description of the event was significant because it reflects (1) Weisinger at the time "felt it to be a consensual non-harmful act"; and (2) Weisinger's "dysfunctional thinking around the issue of sexually acting out with children" showing his sexual deviance. Weisinger was arrested for the offense against Scott but released on bond. While on bond, Weisinger reoffended in May 1982 against Jimmy B. Weisinger told Clayton that he approached Jimmy B. outside their apartment complex and Weisinger performed oral sex on him. When Clayton asked Weisinger why he committed the offense against Jimmy B., Weisinger stated that it was "an impulsive decision" which (according to Clayton) is significant because (1) it speaks to Weisinger's lack of insight and (2) "a person who has a sexually deviant interest or condition combined with impulsivity increases their risk for offending because they're less likely to be able to control their behavior or urges."

Clayton explained this conduct shows Weisinger's emotional and volitional capacity is "extremely limited" especially "as it relates to his sexual acting out or sexual offending, sexual behaviors." According to Clayton, these offenses are

5

important with regard to Weisinger's "functioning not only in the past, but also his thinking and his dysfunction that continues. So, his current report of what happened, his current understanding or insight into what happened is relevant to his current functioning."

For his offenses against Scott and Jimmy B., Weisinger was convicted for sexual abuse of a child and sentenced to ten years' confinement. He did not serve the full sentence and was released on parole. Under his parole conditions, Weisinger was prohibited from having contact with children and was required to participate in sex offender treatment. While on parole, Weisinger stopped receiving treatment, was unable to control his sexual urges, and reoffended against multiple victims.

He was first charged with indecency with a child for exposing himself from his apartment window to a girl named Teresa, whose mother reported Weisinger to the police. An investigation revealed multiple children had reported him for similar conduct. During his interview with Clayton, Weisinger denied the incident with Teresa and claimed "someone else" must have exposed himself. He also was charged with indecency with a child committed against 13-year-old Manuel.

Records further show that Weisinger met 10-year-old Jerry and 12-year-old Jimmy A. through Manuel, performed oral sex on Jerry and Jimmy A., and paid them both. Weisinger was 34 and 35 years old at the time he offended against the boys. During his interview with Clayton, Weisinger stated that Manuel brought the boys to his apartment, "that the boys wanted him to perform oral sex on them. That he agreed. That it was a consensual act that they all agreed to at the time." Clayton explained Weisinger's belief that these sexual acts were consensual is significant because "it speaks certainly to his dysfunctional thinking about sexual behaviors involving children that was present at the time and still present to some degree now." According to Clayton, the offenses against the boys show that his emotional and

6

volitional capacity is significantly limited and impaired.

Clayton also explained that giving the boys money for the sexual acts is significant because it "falls under the category of grooming, in that [Weisinger]'s establishing a relationship with these boys for the purpose of having sexual contact with them and then coercing them in a way to not only see this behavior as appropriate, but to be able to reengage in this behavior. And then also developing sort of a bond to where they would be less likely to report this behavior. So, it's sort of an act of disguising the behavior as well." Clayton also believed Weisinger engaged in grooming behavior because records showed that "oftentimes he would have these boys at his apartment to listen to music or to look at photographs or to talk about his guitar or — he had a bird, a pet bird that the boys liked to look at — things that it appeared he was using to establish a relationship and time spent with these boys." Clayton opined that using these grooming techniques is significant because it speaks to the severity of his sexual deviancy as "his behavior was being dictated by his sexual interests and he was understanding that he was establishing a relationship with these boys for the purpose of . . . sexual contact with them."

For his offenses against Jerry and Jimmy A., Weisinger was convicted of aggravated sexual assault of a child on September 21, 1988, and sentenced to 40 years' confinement. Records indicate that the charges related to Manuel and Teresa were dropped after Weisinger was convicted of committing aggravated sexual assault against Jimmy A. and Jerry.

### *Diagnoses*

Using the Diagnostic and Statistical Manual,[3] Clayton diagnosed Weisinger

---

[3] The Diagnostic and Statistical Manual is the general code book of psychiatric or psychological disorders relied upon by psychologists and psychiatrists.

7

with exhibitionistic disorder because he has a significant persistent history of "a sexual desire and gratification or interest in exposing [himself] to non-consenting persons." Clayton explained that this diagnosis factors into his opinion that Weisinger has a behavioral abnormality because "it's part of his sexual deviancy. It's part of his condition that predisposes him to act out sexually."

Clayton further diagnosed Weisinger with pedophilic disorder. He questioned Weisinger regarding any fantasies Weisinger may have about children. Clayton testified that Weisinger generally "indicated that he continues to have some issue with having sexual interest or desire with children, in particular around the 12, 13, 14 age range males." When Clayton questioned Weisinger "whether or not he has masturbated to thoughts of children since he's been convicted," Weisinger initially claimed that he had not done so for many years but then admitted that "it does continue and has continued at times but that he tries not to do it." Clayton explained this is significant because Weisinger "still has this sexual desire and interest, and he is at times acting upon it."

Clayton testified that Weisinger's pedophilic disorder is a congenital or acquired condition that affects his emotional or volitional capacity and is a lifelong condition (especially in terms of sexual interest and urges). When asked why he concluded that Weisinger still has a pedophilic disorder despite not having committed another sexually violent offense against a child since being imprisoned, Clayton explained his opinion is "not only just based on his history, but based on evidence that he continues to have sexually deviant interests towards children, that that [sic] thinking remains present. He hasn't had the opportunity to act on it in prison, but the interest is still there."

Clayton also diagnosed Weisinger with "other specified personality disorder with mixed personality features" which does not go away but tends to persist

throughout a person's life. Finally, Clayton diagnosed Weisinger with a remitted cannabis use disorder based on Weisinger's extensive abuse and use. However, because Weisinger abstained from using cannabis for a long period of time, the order is considered in remission.

### *Risk Factors*

Clayton explained that there are research-based risk factors which increase a person's risk of sexually reoffending. He identified sexual deviancy as Weisinger's primary risk factor, but also explained why the following numerous risk factors he found for Weisinger were significant in his determination that Weisinger suffers from a behavioral abnormality:

- Committing contact and noncontact offenses;

- Offending against victims who are strangers;

- Reoffending while on bond despite being detected for offending;

- Reoffending while on parole and persistence despite punishment;

- Offending either during or after attending sex offender treatment while on parole;

- Dysfunctional thinking in the past and "to some degree now" that sexual acts with children were consensual;

- Use of grooming techniques;

- Personality disorder;

- Chronicity of sexual violence, "history of offending over many, many years";

- Diversity of violence, male/female victims and contact/noncontact

victims;

- Minimization and/or denial of sexual violence;

- Escalation of sexual violence, increase in frequency and severity;

- Psychological coercion;

- Problems with self-awareness;

- Dysfunctional thought patterns in general;

- Problems with stress and coping combined with sexually deviant interests; and

- History of child abuse.

### *Protective Factors*

Clayton identified Weisinger's age as his sole protective factor; he is 69 years old. Clayton testified that generally research suggests the risk to sexually reoffend decreases as people age. Nonetheless, Clayton opined that Weisinger's age does not negate his behavioral abnormality. He stated that Weisinger's age "doesn't exclude the fact that he still has a condition that makes him likely to reoffend. So, he's still a high risk."

### *Test Results*

Clayton used the Psychopathy Checklist Revised (PCL-R), which is "the gold standard measure for looking at psychopathy or psychopathic personality traits" to evaluate whether Weisinger is a psychopath or has psychopathic traits. Clayton explained that the maximum score on the PCL-R is 40 and that a person's score is based on all available information and the person's entire history. Clayton testified that Weisinger's score was 19, which is a moderate range. A score between 25 and 30 indicates a definite psychopathy. Clayton opined that Weisinger is not "at a level

of being a psychopath or having definite psychopathy, but he does have some traits."

To further evaluate Weisinger, Clayton used the Static-99R and the Risk for Sexual Violence Protocol (RSVP) instruments, which are types of tests formulated to determine whether a person is likely to sexually reoffend. Clayton explained that the Static-99R is an actuarial risk assessment that places a person into a risk category based on 10 different risk factors. Weisinger received a score of three, which placed him "in the top of the average category." Nonetheless, Clayton opined that Weisinger is at a high risk or above average risk to reoffend based on the totality of the information reviewed, including testing instruments, Weisinger's clinical interview, historical information, and numerous other risk factors that are more considered in the RSVP. Clayton testified that under the RSVP, Weisinger's score fell in the high risk range for sexual offending in the future.

### Sex Offender Treatment and Prison Conduct

Additionally, Clayton testified that at the time of trial Weisinger was in an 18-month sex offender treatment program in prison. During his interview, Weisinger told Clayton that (1) he "didn't see himself at risk"; (2) he did not need the treatment to reduce or manage his risk; (3) "most of the things he had learned so far were things that he already knew or that he had already taught himself"; (4) if given the opportunity to seek treatment out in the free world, "he wouldn't do it because he didn't think he really needed it"; and (5) because the treatment was being offered, "he felt like it was good to get all the tools he could."

Clayton testified that his review of Weisinger's treatment records shows the "results have been mixed" because Weisinger has been described as cooperative and engaged at times, but other times as "regressing back to dysfunctional ideas of seeing his victims as not being victims, being consensual behavior, rationalizing his behavior." Clayton opined that the mixed results show a need for continued

11

treatment. He also testified that, based on his interview with Weisinger and his review of all the records, Weisinger does not have all the tools necessary to manage and control his sexual behaviors.

## II.  Weisinger's Testimony

The jury also heard testimony from Weisinger. He admitted starting to expose himself at the age of 12; his first victim was a three-year-old girl who lived with his family at the time. He testified that he continued exposing his genitals to young girls — usually his sister's friends but also to strangers. He testified that the girls seemed to like it when he exposed himself because they giggled and "didn't act like they were appalled." Although he was worried about getting in trouble, he did not stop exposing himself.

Weisinger admitted that at the age of 13, he sexually abused his eight-year-old male cousin by performing oral sex on him. When Weisinger was 16 years old and on probation for shoplifting, he was caught exposing himself to a little girl. He testified that he saw her playing alone in a parking lot, so he drove up to her, exposed his genitals, and then drove off. The case against him was later dropped. After he got caught for the exposure in the parking lot, he participated in group therapy. He testified that despite therapy and even after becoming an adult, he continued exposing himself but not as frequently. He admitted having difficulties controlling his impulses exposing his genitals but claimed he does not have a problem now.

Weisinger agreed that he is currently sexually attracted to male children, even today. He admitted that he used to have sexual fantasies about children, masturbated to those fantasies, and repeatedly acted on those fantasies by seeking out children for sexual contact. Although he could not remember the number of male children with whom he had sexual contact, he estimated the number to be approximately 15.

Weisinger described having sexual contact "approximately ten times" with 10-year-old Forrest when he was 16 years old.

Weisinger further testified that when he was 24 years old, he had sexual contact with two 14-year-old boys: Johnny and Tucker. He testified that he repeatedly had sexual contact with Johnny. Weisinger described it as "mutual oral sex" and did not believe what he was doing with Johnny was wrong.

Regarding his sexual contact with nine-year-old Scott, he admitted performing oral sex on Scott when he was almost 29 years old. He never thought to not engage in sexual activity with Scott.

Weisinger testified that after he was arrested and released on bond for his offenses against Scott, he "went prowling to find someone" and committed a sexual offense against nine-year-old Jimmy B. Weisinger admitted that his way of coping with the stress of being charged for offenses against Scott was to find another child to sexually abuse. Weisinger claimed this had been the first time he went "hunting"; he admitted to losing control over his sexual impulses but claimed he found his actions "[g]ratifying, but not sexually."

Weisinger admitted engaging in sexual activities with brothers Jimmy A. and Jerry after his release from prison on mandatory supervision at the age of 35. He testified that when he was released, he did not feel he "had a problem with the sexual attraction to children" and "needed help for that." Weisinger denied engaging in sexual activity with Manuel, although he admitted being sexually attracted to him. Weisinger further admitted that he engaged in sexual activity with a 15-year-old boy named Tim. He admitted he was sexually attracted to Tim, could not control his sexual impulses, and mostly performed oral sex on Tim.

Weisinger testified that he thinks he needs sex offender treatment but not for

13

"sexual issues." He believes his sexual issues are not the root cause of his sexual problems; instead, he claims his sexual problems are caused by "motivation erosion, avoidance, failure to assume reasonable initiatives, fear of vulnerability, fear of rejection, desire to be admired." He denied telling Clayton that he had thoughts about children and continued to masturbate to those thoughts "within the past few years." He agreed that he needs "to stay away from children" if he is released from prison. He claimed he "learned tools to help" him avoid reoffending, but admitted "there is always the possibility."

Weisinger testified that he considers himself bisexual; he is interested in men, women, and male children. He acknowledged that his sexual attractions will not change but stated that he has been learning in his sex offender treatment how to control his attraction and not reoffend. He testified that he feels he is doing really well in treatment, although he acknowledged that his therapist at times indicated to him "that that's not correct." He stated that he now understands that the boys he offended against were harmed by his actions. He also testified that he was affected by being sexually abused at the age of five because, shortly thereafter, he became sexually active. Weisinger stated that he does not believe he will commit another sexual offense because he now knows how his actions damaged the boys he abused. He testified that he will "probably always have that attraction to boys. I don't think that will go away. I have to learn how to cope with it and how to deal with it." He testified that he plans on "keeping busy and staying active so" he does not reoffend when he gets released from prison.

After considering the evidence presented, the jury found Weisinger to be a sexually violent predator. The trial court signed a final judgment and order of commitment on November 16, 2021. Weisinger filed a motion for new trial and an amended motion for new trial, which was overruled by operation of law. *See* Tex.

R. Civ. P.329b(c).  Weisinger filed a timely appeal.

In two issues, Weisinger contends the evidence is legally and factually insufficient to support the "behavioral abnormality" element of the State's case.

## I.    Standard of Review and Governing Law

The Act requires the State to prove beyond a reasonable doubt that a person is a sexually violent predator.  *Id*. § 841.062(a); *In re Commitment of Baiza*, 633 S.W.3d 743, 749 (Tex. App.—Houston [14th Dist.] 2021, no pet.); *see also In re Commitment of Fisher*, 164 S.W.3d 637, 639-41 (Tex. 2005).

For a legal sufficiency challenge, we employ the criminal standard of review in cases brought under the Act.  *See In re Commitment of Stoddard*, 619 S.W.3d 665, 675 (Tex. 2020).  We must view the evidence in the light most favorable to the prosecution and determine whether any rational factfinder could have found the essential elements of the crime beyond a reasonable doubt.  *Id*. (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *In re Commitment of Thedford*, No. 14-21-00070-CV, 2023 WL 107121, at *2 (Tex. App.—Houston [14th Dist.] Jan. 5, 2023, no pet.) (mem. op.).  The Supreme Court of Texas clarified the distinction between legal and factual sufficiency standards of review in civil commitment cases when, as here, the burden of proof is beyond a reasonable doubt.  *In re Commitment of Stoddard*, 619 S.W.3d at 668; *In re Commitment of Baiza*, 633 S.W.3d at 749.

In both legal and factual sufficiency reviews, we presume the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so, but we may not ignore undisputed facts contrary to a finding.  *In re Commitment of Stoddard*, 619 S.W.3d at 676; *In re Commitment of Baiza*, 633 S.W.3d at 749.  A distinction arises in the treatment of disputed evidence that a reasonable factfinder

could not have credited in favor of a finding — we disregard such disputed evidence in a legal sufficiency review, but we consider this disputed evidence in a factual sufficiency review. *In re Commitment of Stoddard*, 619 S.W.3d at 676; *In re Commitment of Baiza*, 633 S.W.3d at 749.

Evidence is factually insufficient to support a jury finding under the Act when the evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true. *In re Commitment of Stoddard*, 619 S.W.3d at 668, 678; *In re Commitment of Baiza*, 633 S.W.3d at 749.

As provided in the Act, a person is a sexually violent predator if he (1) is a repeat sexually violent offender, and (2) suffers from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Tex. Health & Safety Code Ann. § 841.003(a). A person is a repeat sexually violent offender if, as relevant here, the person is convicted of more than one sexually violent offense and a sentence is imposed for at least one of the offenses. *Id*. § 841.003(b). A behavioral abnormality is defined as "a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." *Id*. § 841.002(2). A predatory act is defined as "an act directed toward individuals, including family members, for the primary purpose of victimization." *Id*. § 841.002(5).

## II.    Sufficiency of the Evidence

We begin by addressing Weisinger's legal sufficiency challenge.

### *Legal Sufficiency*

As part of his first issue, Weisinger asserts that the evidence is legally

insufficient to support the "legislatively intended definition of 'behavioral abnormality'" because "Chapter 841 indicates that it was not intended to apply to non-psychopathic, elderly persons who are about to be released from prison after having served long and 'non-lenient' prison sentences." Weisinger contends that the resolution of this claim requires a judicial construction of the "behavioral abnormality" element according to traditional rules of statutory construction. He contends that, under these statutory-construction rules, we should consider chapter 841's legislative history and legislative findings that "Chapter 841 is meant to apply to 'a small but extremely dangerous group of sexually violent predators'" to which he does not belong. *See id*. § 841.001.

However, the Supreme Court of Texas has clarified that the two statutory elements — repeat sexually violent predator and behavioral abnormality — are the only factors courts should consider in a sufficiency review. *See In re Commitment of Stoddard*, 619 S.W.3d at 676-78. The supreme court explained that the "'small but extremely dangerous group' language, contained in the Act's legislative findings, is not part of the statute's definition of 'sexually violent predator' and [is] not an element the jury [is] required to find." *Id*. at 677 (concluding appeals court erred in finding evidence insufficient when it found, among other things, that appellant was not part of small but extremely dangerous group referenced in legislative findings). Two of our sister courts already have rejected the argument Weisinger advances here. *In re Commitment of McGarity*, No. 12-23-00001-CV, 2023 WL 4308666, at *2-3 (Tex. App.—Tyler June 30, 2023, no pet. h.) (mem. op.) (rejecting request to consider whether appellant was part of "a small but extremely dangerous group" mentioned in legislative findings in light of holding in *Stoddard*); *In re Commitment of Atchison*, No. 01-22-00424-CV, 2023 WL 4003066, at *7 (Tex. App.—Houston [1st Dist.] June 15, 2023, no pet. h.) (mem. op.) (same).

17

Other courts, including this one, have rejected similar arguments. *In re Commitment of Tryon*, 654 S.W.3d 29, 38 (Tex. App.—Eastland 2022, pet. denied) (noting "*Stoddard* has clearly foreclosed" argument that "behavioral abnormality" element must be construed as incorporating Act's legislative findings and legislative history); *In re Commitment of Summers*, No. 01-19-00738-CV, 2021 WL 3776751, at *14 (Tex. App.—Houston [1st Dist.] Aug. 26, 2021, no pet.) (mem. op.) (declining request to consider whether appellant was part of "small but extremely dangerous group" mentioned in legislative findings in light of supreme court's holding in *Stoddard*); *In re Commitment of Ausbie*, No. 14-18-00167-CV, 2021 WL 1972407, at *11 (Tex. App.—Houston [14th Dist.] May 18, 2021, pet. denied) (mem. op.) (declining request, in light of *Stoddard*, to examine legislative history to construe intended meaning of "behavioral abnormality"). We also conclude that Weisinger's argument that the evidence is legally insufficient to support a finding that he meets the legislatively intended definition of "behavioral abnormality" is foreclosed by *Stoddard*.

Besides Weisinger's argument we addressed above, the only other contention he makes in challenging the legal sufficiency of the evidence is to state:

> The evidence is legally (and factually) insufficient to support the "behavioral abnormality" element of the State's case also because of Clayton's undisputed testimony that he did not know for sure whether Mr. Weisinger would be "good to go" upon his anticipated successful completion of the TDCJ 18-month sex-offender treatment program. This would have to make the evidence legally (and factually) insufficient to support a finding that Mr. Weisinger would be at "increased risk" to sexually reoffend upon successful completion of this program.

First, we note that Weisinger fails to explain how this alleged testimony would render the evidence legally insufficient in light of Clayton's other extensive testimony explaining why it is his opinion that Weisinger suffers from a behavioral

18

abnormality. Second, Weisinger neglects to present Clayton's testimony in context. Clayton responded to questioning from Weisinger's attorney as follows:

> Q. I think you testified — I think you testified on direct examination that the successful completion of a sex offender treatment program brings down risk?
>
> A. Yes.
>
> Q. What you can't tell a jury is how much; is that right?
>
> A. It depends — right. It depends on the individual for sure.
>
> Q. So, if Mr. Weisinger in a couple of months out gets his certificate, he may be good to go; is that right?
>
> A. I don't know.
>
> Q. You don't know?
>
> A. I would say unlikely, but I don't know for sure.

Clayton never testified that successful completion of treatment eliminates the risk of reoffending so as to negate his conclusion that Weisinger suffers from a behavioral abnormality. Third, Clayton considered it a risk factor that Weisinger had reoffended back when he was on parole after his convictions for sexual abuse of a child even though he had attended sex offender treatment. He stated that individuals who reoffend post-participation in treatment tend to reoffend at a higher rate.

Fourth, Clayton also considered Weisinger's view regarding his need for sex offender treatment; Weisinger had told Clayton that (1) he "didn't see himself at risk"; (2) he did not need the treatment to reduce or manage his risk; (3) "most of the things he had learned so far were things that he already knew or that he had already taught himself"; (4) if given the opportunity to seek treatment out in the free world, "he wouldn't do it because he didn't think he really needed it"; and (5) because the treatment was being offered, "he felt like it was good to get all the tools he could." Clayton explained why Weisinger's "view on his need for sex offender treatment" is significant:

19

I mean, it definitely relates to not only his insight into his sexual interest and sexual dysfunction and need to manage his risk, but a person's motivation towards treatment tends to oftentimes really impact how well they can do in treatment, how well they can progress, how quickly they can progress, and then how well they can take the things from treatment with them once treatment is over. So, motivation and insight definitely impacts your treatment response.

Fifth, with regard to Weisinger's current sex offender treatment, Clayton testified that his review of Weisinger's treatment records shows the "results have been mixed" because Weisinger has been described as cooperative and engaged at times, but other times as "regressing back to dysfunctional ideas of seeing his victims as not being victims, being consensual behavior, rationalizing his behavior." Clayton opined that the mixed results show a need for continued treatment. He also testified that, based on his interview with Weisinger and his review of all the records, Weisinger does not have all the tools necessary to manage and control his sexual behaviors.

Finally and as discussed in detail above, Clayton based his opinion that Weisinger suffers from a behavioral abnormality on a holistic evaluation of Weisinger, considering (1) Weisinger's extensive sexual offending history that started when he was a juvenile and persisted throughout adulthood; (2) numerous research-based risk factors; (3) that Weisinger has (a) an exhibitionistic disorder which is part of his sexual deviancy and "part of his condition that predisposes him to act out sexually," (b) an "other specified personality disorder with mixed personality features" which tends to persist throughout a person's life, and (c) a pedophilic disorder that is a congenital or acquired condition that affects his emotional or volitional capacity and is not something that goes away, even with age, but is a lifelong condition; (4) test results that revealed psychopathic traits under the PCL-R, a Static-99R score that placed Weisinger "in the top of the average category," and a RSVP score that fell in the high risk range for sexual offending in

the future; (5) the success of past sex offender treatment and current treatment; and (6) Weisinger's conduct in prison.

Viewing the evidence in the light most favorable to the jury's verdict, we conclude the evidence presented at trial is legally sufficient to support a finding beyond a reasonable doubt that Weisinger has a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence. Accordingly, we overrule Weisinger's first issue.

### *Factual Sufficiency*

In his second issue, Weisinger contends the evidence is factually insufficient to support the "behavioral abnormality" element of the State's case because the evidence is undisputed that (1) his age is advanced; (2) he served over 30 years in prison so that his past behavior outside of prison is not a good predictor of his future behavior; (3) he scored a "3" on the Static-99R; (4) he scored less than "30" on the PCL-R; (5) he is not a psychopath; and (6) it is anticipated that he will successfully complete the sex offender treatment program in prison. We disagree.

First, chapter 841 does not mention age, and "'no court has the authority, under the guise of interpreting a statute, to engraft extra-statutory requirements not found in a statute's text.'" *In re Commitment of McGarity*, 2023 WL 4308666, at *7 (quoting *PHI, Inc. v. Tex. Juv. Just. Dep't*, 593 S.W.3d 296, 305 (Tex. 2019) (citing *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 872 (Tex. 2014))). Although Weisinger was 69 years old at the time of trial, his age does not negate his behavioral abnormality. *See id.*; *In re Commitment of Tryon*, 654 S.W.3d at 41 (holding that advanced age, standing alone, is insufficient to reverse a jury's verdict); *In re Commitment of Fielding*, No. 08-22-00026-CV, 2022 WL 17485580, at *9-10 (Tex. App.—El Paso Dec. 7, 2022, no pet.) (mem. op.) (holding evidence factually sufficient when expert explained why he rejected advanced age as protective factor);

*In re Commitment of Delarosa*, No. 03-21-00541-CV, 2022 WL 3403347, at *8-9 (Tex. App.—Austin Aug. 17, 2022, no pet.) (mem. op.) (finding evidence factually sufficient despite appellant's advanced age). Clayton may have identified Weisinger's age as his sole protective factor, but Clayton also opined that Weisinger's age does not negate the fact that he suffers from a behavioral abnormality and it "doesn't exclude the fact that he still has a condition that makes him likely to reoffend. So, he's still a high risk."

Second, Weisinger's contention that his past behavior outside of prison is not a good predictor of his future behavior because over 30 years have passed since his last offense is negated by Clayton's testimony. Clayton testified several times that it is "highly relevant" to consider a person's whole history when determining whether a person has a behavioral abnormality. He explained why he looked at historical information in determining whether "Weisinger has a behavioral abnormality today" as follows:

> Well, I'd say two things in particular. One is that in order to understand a person today, it's relevant and important to understand everything about that person's background that contributes to where they're at in the present moment, that your present moment is a compilation of your entire history. So, the more I know about your history, the better, more clearer, more exhaustive picture I'm getting about the person.
>
> The other thing that's relevant is that . . . [t]hat past behavior is a good predictor of future behavior. So, understanding previous behavior is relevant to understanding a person's risk for that type of behavior in the future.

In Clayton's expert opinion, past behavior is a relevant and good predictor of future behavior. Clayton firmly rejected Weisinger's attorney's accusation that Clayton made assumptions based on "what happened 50 years ago, 40 years ago, 30 years ago." Clayton stressed that he formed his opinion based on his examination and the totality of the information. Further, Clayton disagreed with an implication that

Weisinger would not reoffend if released from prison because "nothing" occurred in prison in over 30 years "that would suggest that he won't function as appropriately in society."

Third, with regard to Weisinger's Static-99R and PCL-R scores, Clayton explained that although the scores on these two instruments were in the moderate range and "in the top of the average category," respectively, he believed Weisinger's risk of reoffending to be above average. Clayton based his opinion on Weisinger's RSVP score, which fell in the high-risk range for sexual offending in the future, and "the totality of the information, including instruments and clinical interview and history information."

Fourth, we already rejected the argument that the evidence is insufficient to support a finding of behavioral abnormality because the person was not determined to be a psychopath. *See In re Commitment of Hutyra*, No. 14-17-00669-CV, 2018 WL 3911136, at *6 (Tex. App.—Houston [14th Dist.] Aug. 16, 2018, pet. denied) (mem. op.). Instead, we found that "the only question a jury must answer in a civil commitment trial is whether a person suffers from a behavioral abnormality that makes that person predisposed to committing sexually violent acts." *Id*. (citing *In re Commitment of Bohannan*, 388 S.W.3d at 306). Even though a medical diagnosis of a person's mental health may inform an assessment of whether that person has such a behavioral abnormality, determining whether a person suffers from a predisposing condition does not rest solely on such a diagnosis. *Id*. at *6; *see also In re Commitment of Bohannan*, 388 S.W.3d at 306.

Lastly, we conclude that Weisinger's contention that the evidence is factually insufficient because it is anticipated that he will successfully complete sex offender treatment in prison lacks merit. Although successful completion of treatment may be a protective factor, Weisinger had not completed his treatment at trial. Weisinger

23

offers no authority to support his position that anticipated completion of sex offender treatment renders the evidence insufficient to support the jury's finding. Further, Clayton testified that, based on treatment records, Weisinger's participation and progress in the treatment program had mixed results because Weisinger had been described as cooperative and engaged at times, but other times as "regressing back to dysfunctional ideas of seeing his victims as not being victims, being consensual behavior, rationalizing his behavior."

There was no assurance at trial that he would complete the program successfully, especially since he did not appreciate the benefits thereof. In that respect, Clayton testified that Weisinger told Clayton (1) he "didn't see himself at risk"; (2) he did not need the treatment to reduce or manage his risk; (3) "most of the things he had learned so far were things that he already knew or that he had already taught himself"; (4) if given the opportunity to seek treatment out in the free world, "he wouldn't do it because he didn't think he really needed it"; and (5) because the treatment was being offered, "he felt like it was good to get all the tools he could."

We have reviewed the entire record in accordance with the applicable standard of review. After doing so, we cannot conclude that there is any evidence so significant that the jury could not have determined beyond a reasonable doubt that Weisinger has a behavioral abnormality. Accordingly, we overrule Weisinger's second issue.

## CONCLUSION

We affirm the trial court's final determination.

24

/s/ Meagan Hassan
Justice


Panel consists of Justices Zimmerer, Spain, and Hassan.